UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SOHAM SHAH,

*Plaintiff*,

v.

NETFLIX, INC., NETFLIX WORLDWIDE
ENTERTAINMENT, LLC, and HWANG
DONG-HYUK,

*Defendants*.

---

No. 24-CV-6925 (RA)

<u>OPINION & ORDER</u>

RONNIE ABRAMS, United States District Judge:

Plaintiff Soham Shah, an Indian citizen and resident, commenced this action against Defendants Netflix, Inc., Netflix Worldwide Entertainment, LLC (jointly, "Netflix" or the "Netflix Defendants"), and Hwang Dong-Hyuk ("Hwang"), alleging that season one of their 2021 South Korean television series *Squid Game* infringes Plaintiff's copyright of the 2009 Indian film *Luck* (the "Film") and 2008 screenplay for the same (the "Screenplay"). Before the Court are motions of Hwang to dismiss for lack of personal jurisdiction; and of Netflix to dismiss for lack of standing and failure to state a claim, in which Hwang also joins. Because the Court indisputably has personal jurisdiction over the Netflix Defendants, and Hwang's Rule 12(b)(2) motion turns on facts in dispute, the Court assumes without deciding that it has personal jurisdiction over Hwang and proceeds to the merits of Defendants' Rule 12(b)(6) motion.

Defendants jointly, and principally, argue that the complaint must be dismissed because *Squid Game* and *Luck* are not substantially similar. They further assert that dismissal is warranted because Plaintiff has not adequately alleged his copyright ownership of the Film or Defendants' access to the Film or Screenplay, two elements that are necessary to state an infringement claim.

For the reasons set forth herein, the Court finds that Plaintiff has not adequately alleged his ownership of the Film, and that, in any event, it is clear that the two works are not substantially similar. Accordingly, the Court grants Defendants' 12(b)(6) motion to dismiss for lack of standing and failure to state a claim and dismisses the complaint.

## BACKGROUND

The following facts are drawn from Plaintiff's complaint and those exhibits that are "incorporated in it by reference"—here, the *Luck* Film and Screenplay, and season one of the *Squid Game* series. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). The Court assumes well-pleaded facts to be true, and draws all reasonable inferences in favor of Plaintiff, except where the pleadings conflict with "the works themselves," which "supersede and control contrary descriptions of them." *Peter F. Gaito Architecture, LLC* v. *Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010); *see also Piuggi v. Good for You Prods. LLC*, 739 F. Supp. 3d 143, 151 n.1, 154 (S.D.N.Y. 2024).

### I.     The Parties

#### A.  Plaintiff Soham Shah

Plaintiff Soham Shah, an Indian citizen and resident, is a screenwriter, scriptwriter, and director. Dkt. No. 1 ("Compl.") ¶ 10. He created and is the exclusive owner of the copyright in the "Luck Story" and Screenplay. *Id.* ¶ 4.[1] Plaintiff alleges that the Luck Story includes "the characters, plot, themes, and full treatment (with some screenplay elements) of the story that was manifested again in future drafts and works, including the . . . Luck Screenplay and then fully realized in the Luck Film." *Id.* ¶ 18. Plaintiff wrote the Luck Story in 2006, registered it with the Screenwriters

---

[1] Although Plaintiff's complaint repeatedly references the Luck Story, he does not claim infringement of the Luck Story itself and his claims do not appear to rely on the Story. Indeed, his opposition to the Rule 12(b)(6) motion does not refer to the Luck Story at all, but rather to the Screenplay and the Film.

Association of India in 2007, and registered the title "Luck" with the Association of Motion Pictures & T.V. Programme Producers in 2007. *Id.* ¶¶ 10, 17–18.

In October 2008, Shah entered into agreements with movie producer Shree Ashtavinayak Cine Vision Ltd. ("Shree") to provide his services as a story writer, screenplay writer, dialogue writer, and director for the Film. *Id.* ¶¶ 20–21. Pursuant to this agreement, Shah "provided Shree with the Luck Story," *id.* ¶ 21, and the completed Screenplay, *id.* ¶ 22, and "authorized" it to produce the Film from the Screenplay, *id.* ¶ 23. According to the complaint, Shah assigned his rights in the Luck Story and Screenplay to Shree for purposes of "cinematograph rights," which "entitle the owner of [such] rights to make, copy and sell, rent or communicate a film to the public." *Id.* ¶ 24.[2]

Although he does not hold the copyright in the Film, Plaintiff asserts that he "owns certain copyright interests" in it, pursuant to the Indian Copyright Act of 1957. *Id.* ¶ 4. Yet his allegations on this point are vague. Plaintiff alleges that, under Indian law, he "maintains an ownership interest" in the Film, which "entitles [him] to a portion of proceeds from 'utilisation of the work in any form other than for the communication to the public of the work, along with the cinematograph film in a cinema hall.'" *Id.* ¶ 29 (quoting Indian Copyright Act, 1957 ("ICA"), ch. 4, § 19(9)). Although Plaintiff admits that "Shree[] own[s] the copyright in the Luck Film," he asserts that such ownership "does not affect, let along diminish, [his] copyrights in the component works"—meaning that he "retains exclusive ownership rights in the Luck Screenplay . . . for purposes of creating a Web Series, TV Series, or exploitation rights of any kind other than as a cinematograph film . . . ." *Id.* ¶ 28.

---

[2] Plaintiff further alleges that he "did not assign[] his exclusive rights in the Luck Story and the Luck Screenplay for any purposes other than cinematograph rights." Compl. ¶ 24.

On December 15, 2023, Shemaroo Entertainment Limited ("Shemaroo") filed an application for copyright registration of the Film with the Indian Copyright Office. *Id.* ¶ 31. Plaintiff professes not to know "why Shemaroo purports to own the copyright in the Luck Film, whether any assignments have taken place and/or been properly documented, or whether they are valid." *Id.*

Plaintiff submitted an application for registration of the Screenplay, but not the Film, with the United States Copyright Office in September 2024. *Id.* ¶ 25. His application is pending. *Id.*

### B. Defendants

Hwang is the creator of the television series *Squid Game*, which Netflix released on September 17, 2021. *Id.* ¶ 1. Hwang has said that he originally wrote the story in 2009 as a feature film, the same year as *Luck*'s global release. *Id.* ¶ 43. He purports to have conceived of the idea following the controversial release of his first feature film in 2007, after which he found himself "helpless and broke." *Id.* ¶ 45. He thought at that time that "if he could earn a huge prize as he saw in the comic books he read, he himself would join such a game." *Id.* ¶ 45.

Hwang lives in South Korea, having previously studied film at the University of Southern California. *Id.* ¶ 43. Plaintiff alleges that Hwang has entered into contracts in the Southern District, has "frequently" attended events and award shows in New York, and has also "engag[ed] in promotional activities" related to *Squid Game* within the State. *Id.* ¶ 14.

The Netflix Defendants are Delaware corporate entities with their principal places of business in California. *Id.* ¶¶ 11–12. Netflix, Inc. has corporate offices in this district and is registered to do business in the State. *Id.* ¶ 11. Netflix Worldwide Entertainment, LLC—an affiliate of Netflix, Inc.—holds U.S. copyrights in the *Squid Game* series. *Id.* ¶ 12.

## II.    Overview of the Works

Although the Court presumes familiarity with *Luck* and season one of *Squid Game*, it briefly summarizes each below. The Court engages in a more fulsome comparison of these works in its discussion of whether they are substantially similar under copyright law below.

### B.  The *Luck* Screenplay and Film

The *Luck* Film is a 2009 Hindi-language feature-length movie based on Plaintiff's 2008 Screenplay of the same name. *See id.* ¶ 2; Dkt. No. 29, Ex. 1 (*Luck* Screenplay), Ex. 2 (*Luck* Film, or "LF"). The Film "was released worldwide" to "theaters in India, the United Kingdom, the United States, and the United Arab Emirates, among other countries," and was "released to viewers in Canada, Romania, and Russia." Compl. ¶ 27. According to Plaintiff, the Film had a "far-reaching impact," principally because it "starred some of the biggest names in Bollywood." *Id.* ¶ 36. The Screenplay allegedly became accessible to Defendants through the Film's "spoken dialogue" and "printed subtitles," and the Luck Story was accessible "in material part" by way of the same. *Id.* ¶ 57.[3]

The Film follows protagonist Ram Mehra, a single man who lives with his recently widowed mother in Mumbai, India and soon joins a game of luck with life-or-death stakes. *Id.* ¶¶ 32–33, 35; LF 1:35. At the beginning of the Film, Ram is seeking to obtain a visa to the United States, where he expects to be paid at a higher rate than at his current employment in India, in order to pay off a large debt that he inherited from his recently deceased father. LF 12:50–14:08, 15:28–15:47. Eventually, he is enticed to join the game of luck, where he will have an opportunity to pay off his debts and obtain the visa he seeks. LF 50:10–52:10.

---

[3] In light of these allegations, the parties are in apparent agreement that the substantial similarity analysis hinges on the content of the Film. Indeed, their briefing cites only to the Film and no party argues that there are material differences between the Film and the Screenplay. *See* Dkt. No. 28 ("Defs.' 12(b)(6) Mot.") 12 n.8; Dkt. No. 34 ("Pl.'s 12(b)(6) Opp'n") 11–24. The Court therefore, like the parties, cites to the Film rather than the Screenplay.

At the Film's outset, viewers are introduced to Karim Musa,[4] the creator of the game at the core of the Film. Musa has been lucky his whole life, LF 9:57–10:46, has traded on his luck to obtain success—predominantly, it seems, through illicit means, LF 11:30—and has created the game as a kind of "high stakes gambling" made more interesting by the participants' good fortunes. Compl. ¶ 34; LF 11:35, 1:11:10. The Film's opening credits feature Musa singing and dancing with a number of women to a song that emphasizes the importance of luck. LF 5:42–9:10, 7:45–7:53 ("It is not about the money. / Not about the honesty. / Don't you think it's rather funny? / Luck, luck, luck is the key."). Only those who appear to have exceptionally good fortune, therefore, are invited to participate in the game. *See* LF 59:17 ("Two types of people take part in this game. Those who have good luck. And those who have very good luck."). As Musa explains, "Gambling becomes interesting when the opponent has strong luck." LF 1:11:10. Not only do participants receive more money the longer they survive, but outsiders bet on the contestants they think are most likely to succeed. LF 41:24–42:08, 1:58:10.

Musa and his frontman Tamaang are next shown recruiting participants for their latest installment of the game by seemingly seeking out lucky people from around the world. LF 34:20–45:28. Ram meets Tamaang when he is fleeing from the police after having stolen money using a stranger's ATM card. LF 21:40. When Tamaang entices Ram to join him in a night of gambling, it becomes apparent that Ram has extraordinary good luck. LF 24:28–31:58. Although he is hesitant to join the game, Tamaang and Musa are eager to recruit him because third parties have already placed significant bets on Ram's success in the game. LF 50:50–51:00. The two eventually convince Ram to join with promises of money, a visa, and a "U-turn" in life. LF 50:10–52:09.

---

[4] Plaintiff refers to the character as "Musa" in the complaint, *see* Compl. ¶¶ 38, 67, and "Moussa" in his opposition papers, *see* Pl.'s 12(b)(6) Opp'n 12, 14–15, 18. Except as necessary when quoting, the Court will observe the spelling convention of the complaint, which is consistent with the jacket of the DVD of the Film submitted to this Court. Dkt. No. 29 Ex. 2.

Selected contestants soon travel from their home countries to Cape Town, South Africa, where they participate in the game during the day and spend much of their remaining time in a hotel. LF 52:09–54:09, 1:11:58. There, Ram forms bonds with three other contestants. The first is Major Jabar Pratap Singh ("Major"), who has never been injured in battle and joins the game to pay for his wife's medical care. LF 38:26–42:08. The second is Shortcut, a teenager whose parents sold her into slavery in Pakistan, where she raced camels to great success. LF 35:06–37:15, 1:38:25–1:38:54. Tamaang has paid for her freedom to allow her to join the game, and—presumably because she does not yet have money of her own—she appears to be seeking financial freedom through success in the game. LF 37:28, 1:39:16–1:39:50. The third and most significant bond Ram forms is with Natasha, who becomes Ram's romantic interest. LF 1:35:20–1:37:41. Natasha is posing as her twin sister Ayesha, a former winner of the game who committed suicide. LF 59:29, 1:58:35–1:59:53. Natasha unsuccessfully attempts to avenge Ayesha by killing Musa. LF:56:55–1:57:35. She ultimately survives not due to her own luck, but because of Ram, who repeatedly saves her from death. LF 1:34:14, 1:44:25. The Film features a fourth notable supporting character, Raghav Raghuvaran, who recently escaped a death sentence and was released from prison after the rope with which he was to be executed tore in half. LF 14:15–44:11. He, perhaps even more so than Musa, is the Film's antagonist.

In *Luck*, contestants earn money for each dangerous and violent round of the game they survive. The rounds include firing a gun at another player without knowing whether the gun will fire a bullet or a blank, LF 1:00:39–1:05:17; jumping from a helicopter without knowing whether their backpack holds a parachute, LF 1:27:24–1:34:40; and finding the right key to unlock the handcuffs that attach them to a sinking shipping container before they drown or are attacked by sharks, LF 1:41:44–1:46:24. In the final round, Ram must save Natasha, who is tied to a speeding

7

train that is set on a collision course with a fuel tank. LF 2:00:33. After succeeding, Ram challenges Musa and loses. LF 2:10:00–2:13:08. Ram is shot but survives because of his luck—due to a rare medical condition, his heart is located on the wrong side of his body. LF 2:13:35–2:14:08.

At the end of the Film, Ram is depicted in the hospital, surrounded by Musa, Tamaang, and Natasha. 2:13:10, 2:14:22. Although Tamaang states at the outset of the Film that there can be only one winner, LF 59:36, Ram survives to reunite with Natasha and live an "honorable life"; Major lives and pays for his wife's medical care, saving her life; and Shortcut, who leaves the game due to a shark bite, prospers with the assistance of a prosthesis. LF 2:15:40–2:16:04. In the closing scene, the four friends are depicted smiling and in stylish clothing as they strut together confidently out of what appears to be a casino. LF 2:15:38. Highly choreographed, Bollywood-style dancing and singing by Ram and Natash follow, along with outtakes from filming, as the credits roll. LF 2:16:12.

### C.  *Squid Game* Season 1

*Squid Game* Season 1 is a nine-episode Korean drama that follows protagonist Seong Gi-hun as he competes to make money in a terrifying game, also with life-or-death stakes. Dkt. No. 29, Ex. 3 (*Squid Game* Season 1).[5] At the beginning of the show, Gi-hun is living with his mother in Seoul, South Korea. He has accrued substantial debt, apparently due to poor financial decisions—including borrowing from loan sharks, stealing money from his mother, and frequent gambling. E1 4:20–9:50.

Early in the series, Gi-hun encounters a strange, well-dressed man in the subway (the "Suit Man") who offers him money if he can win at a Korean children's game called *ddakji*. E1 18:50. Given that Gi-hun has no money, after each round he loses, the man slaps him. E1 20:15–21:11.

---

[5] Citations to each episode are denominated with "E" followed by the episode number and timestamp.

When he finally wins a round, the man gives Gi-hun the promised money as well as an invitation to join a mysterious game with the opportunity to earn more. E1 21:25–23:45. Later that day, his mother tells him that his daughter is going to move to the United States with her mother, and that he will likely lose touch with her unless he can earn enough money to obtain custody, which he lost in his divorce. E1 27:00–28:42. That night, Gi-hun accepts the offer to join the game. E1 29:46.

In the next scene, Gi-hun enters a strange car, where he is gassed, only to wake on a bunk bed in a large room filled with nearly five hundred other awakening contestants. E1 30:40–31:50. Each player is wearing a green utilitarian uniform with a player number on his chest. E1 31:46, 35:00. Characters are nearly exclusively referred to, and come to be known, by their player numbers. Each of the players is in debt. E1 37:48–38:25.

Over the course of the season, the players compete in a series of six children's games. Those who lose are killed or shot by the masked guards. With each death, the pot of money available to the winner increases. E2 5:11–6:12.

A number of sub-plots develop during the season. Certain guards, for example, are secretly harvesting and selling organs of players who lost the game. E5 18:00–18:56. A police detective infiltrates the island to find his brother, who went missing after he participated in the game. The detective ultimately learns that his brother once won the game, E5 46:30, and is now a high-ranking member of the underground organization that orchestrates the game, E8 14:48.

After Gi-hun becomes the last surviving player in the game, he returns to Seoul with a bank card to access his prize money. E9 17:06. His mother has passed away, E9 22:34, and he is tormented by the deaths he witnessed in the game, E9 19:52–20:18, including that of a childhood friend, whom he had to fight in the final game, E9 4:02–13:55. A year later, he receives an

9

invitation from Oh Il-nam. E9 27:58. Il-nam was an older, seemingly simple but kind friend to Gi-hun during the game, *see* E2 43:30, who appeared to have been killed off-screen in episode six, E6 53:33–56:53. In a surprise twist in the final episode, it turns out that Il-nam is not the kind-hearted, simple man Gi-hun thought him to be, but sophisticated, cynical, and a leader of the organization that runs the game. Gi-hun learns that Il-nam created the game based, it seems, on his childhood memories. E9 38:50–40:20. He explains why he did so as he dies of a brain tumor. E9 29:22–41:40.

As the series draws to its end, Gi-hun, having finally accessed his game winnings, is on his way to visit his daughter in the United States, when he sees someone playing *ddakji* in the subway, presumably being recruited to join the game. E9 46:42–47:38. In the final scene, Gi-hun is on the jet bridge about to board his plane, when, instead, he calls the same number he used to accept his invitation to join the game. This time, he demands to know who runs the organization and "how [they] can commit such atrocities." E9 48:50–50:30. Gi-hun then turns around, seemingly in an effort to return to Seoul and seek some form of revenge. E9 50:33.

Following its release in 2021, the series received critical acclaim—including six Emmy awards, became Netflix's "most-watched show," and "increased Netflix's market value." Compl. ¶¶ 1, 50–52.

### III.    Procedural History

Plaintiff commenced this action on September 13, 2024. Dkt. No. 1. Hwang timely moved to dismiss for lack of personal jurisdiction, Dkt. No. 30, and all Defendants moved to dismiss for lack of standing and failure to state a claim, Dkt. No. 27.

## LEGAL STANDARDS

### I.    Rule 12(b)(2)

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must

make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).[6] While a court "read[s] the pleadings and any supporting materials in the light most favorable to the plaintiffs," it "also require[s] that the plaintiffs make legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021).

"Determining personal jurisdiction over a foreign defendant in a federal-question case such as this requires a two-step inquiry." *Licci*, 732 F.3d at 168. The court first "look[s] to the law of the forum state to determine whether personal jurisdiction will lie." *Id.* "If jurisdiction lies, [the court] consider[s] whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution." *Licci*, 732 F.3d at 168.

## II.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering a Rule 12(b)(6) motion, a court "accept[s] plaintiffs' plausible allegations as true and draw[s] all reasonable inferences in their favor." *Fernandez v. Zoni Language Ctrs., Inc.*, 858 F.3d 45, 48 (2d Cir. 2017). A plaintiff is entitled to relief if the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at

---

[6] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

570. "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

For the following reasons, the Court assumes without deciding that it has personal jurisdiction over Hwang, and grants Defendants' motion to dismiss for lack of standing as to the Film and for failure to state a claim.

### I.    Hwang's Rule 12(b)(2) Motion to Dismiss

Hwang, a South Korean resident, moves to dismiss for lack of personal jurisdiction, arguing that he lacks sufficient contacts with New York State to give rise to personal jurisdiction over him in the Southern District. *See* Dkt. Nos. 30–31. Plaintiff opposes, maintaining that he has established a *prima facie* case of personal jurisdiction because he has alleged that Defendant entered contracts in the district, transacted business here, and traveled to New York for award shows. Dkt. No. 33, at 2. In the alternative, Plaintiff seeks jurisdictional discovery. *Id.* at 4–6.

"Ordinarily, [the court] would address any challenge to personal jurisdiction prior to deciding the merits of the cause of action." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012). The district court may, however, "assume personal jurisdiction" and reach the merits of a case in particular circumstances. *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 347 (2d Cir. 2018) (Calabresi, J., concurring). This action presents such a case.

"[I]n cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal

sufficiency of the plaintiff's cause of action, [the court] may address first the facial challenge to the underlying cause of action and, if [it] dismiss[es] the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants." *Naranjo*, 667 F.3d at 246 n.17. "This is particularly true when the personal jurisdictional challenges are based on factual allegations that are, in this early posture, still under development." *Id.*; *see also Wallert v. Atlan*, 141 F. Supp. 3d 258, 287 (S.D.N.Y. 2015) (declining to analyze personal jurisdiction as to one defendant and denying jurisdictional discovery in light of the court's dismissal of copyright infringement claims for lack of standing).

Because the Court indisputably has personal jurisdiction over the Netflix Defendants, it must reach the merits of Defendants' Rule 12(b)(6) motion regardless of whether it has personal jurisdiction over Hwang. Furthermore, personal jurisdiction over Hwang will ultimately depend on disputed facts "still under development," *Naranjo*, 667 F.3d at 246 n.17—including what contracts, if any, he has entered in this State and the extent of his other contacts here. Under these circumstances, and guided by *Naranjo*, the Court finds it appropriate to assume without deciding that it has personal jurisdiction over Hwang.

## II.     Defendants' Rule 12(b)(6) Motion to Dismiss

The Court turns next to Defendants' Rule 12(b)(6) motion. To survive a motion to dismiss a claim of copyright infringement, a plaintiff must adequately plead "(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." *Urbont v. Sony Music Ent.*, 831 F.3d 80, 88 (2d Cir. 2016). "To satisfy the second element, a plaintiff must demonstrate that (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work." *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020).

Defendants move to dismiss the copyright infringement claims asserting that (1) Plaintiff lacks standing in the *Luck* Film for purposes of Count II because he does not hold the copyright to the Film; (2) Plaintiff has not adequately alleged that Defendants actually copied Plaintiff's work, primarily because he has not plausibly alleged Defendants' access to the Film or Screenplay; and (3) *Squid Game* is not substantially similar to *Luck*. The Court assumes for purposes of the instant motion that Plaintiff has demonstrated actual copying by Defendants. *See Gaito*, 602 F.3d at 63 (assuming actual copying occurred and analyzing substantial similarity); *Davis v. Am. Broad. Co.*, No. 22 Civ. 5944 (KPF), 2024 WL 1178014, at *12 n.8 (S.D.N.Y. Mar. 19, 2024) (same). Next, it finds that Plaintiff has not adequately alleged copyright ownership of the Film and that, even if he had, the *Luck* Film and Screenplay are plainly not substantially similar to *Squid Game*. Defendants' Rule 12(b)(6) motion is therefore granted.

## A. Standing as to the Film

Defendants argue that Plaintiff lacks standing to bring Count II for copyright infringement of the Film because he has not adequately alleged copyright ownership of that work.[7] The Court agrees.

"Where, as here, a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating that it has standing to sue." *Ripple Analytics Inc. v. People Ctr., Inc.*, No. 24-490, 2025 WL 2446314, at *4 (2d Cir. Aug. 26, 2025). "Factual allegations of standing must be plausible and nonconclusory to survive a motion to dismiss." *Collins v. Ne. Grocery, Inc.*, 149 F.4th 163, 170 (2d Cir. 2025).

The parties dispute whether the laws of India or the United States govern copyright

---

[7] Defendants do not dispute that Plaintiff holds the copyright in the Screenplay.

ownership of the Film.[8] Defendants argue that U.S. law controls, Dkt. No. 36 ("Defs.' 12(b)(6) Reply") 1, while Plaintiff insists that Indian law does, Pl.'s 12(b)(6) Opp'n 3 & n.3.

With respect to copyright ownership, "the usual rule is that the interests of the parties in property are determined by the law of the state with the most significant relationship to the property and the parties." *Itar-Tass*, 153 F.3d at 90. Because the Film was created in India, Plaintiff is an Indian national, and Shree is an Indian company, Compl. ¶¶ 2, 10, 18, 30, Indian law governs the copyright's ownership.[9] *Cf. Itar-Tass*, 153 F.3d at 90 ("Since the works at issue were created by Russian nationals and first published in Russia, Russian law is the appropriate source of law to determine issues of ownership of rights.").

"Selection of [foreign] law to determine copyright ownership is" further "subject to one procedural qualification. Under United States law, an owner (including one determined according to foreign law) may sue for infringement in a United States court only if it meets the standing test of 17 U.S.C. § 501(b), which accords standing only to the legal or beneficial owner of an exclusive right." *Itar-Tass*, 153 F.3d at 91. Thus, the Court must also assess whether Plaintiff "own[s] an exclusive right," as "determined by [Indian] law." *Id.* at 92. The Court finds that Plaintiff has not plausibly alleged that he is the copyright holder or a beneficial owner of an exclusive right in the Film.

---

[8] It is undisputed, however, that domestic law applies with respect to Plaintiff's infringement claim. "On infringement issues, the governing conflicts principle is usually *lex loci delicti*, the doctrine generally applicable to torts." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 91 (2d Cir. 1998). Here, U.S. law applies to Plaintiff's infringement claims, "since not only is this country the place of the [purported] tort, but also [two Defendants are] United States corporat[e entities]." *Id.*

[9] Although the Berne Convention, on which Defendants rely, suggests that application of U.S. law is more appropriate, *see* Berne Convention, Art. 14*bis* (2)(a) ("Ownership of copyright in a cinematographic work shall be a matter for legislation in the country where protection is claimed."), "this provision 'is not a part of domestic law' . . . and therefore, 'courts are free to apply to ownership issues involving foreign cinematographic works the law of the country of origin [of those works].'" *Crezioni Artistiche Musicali, S.r.l. v. Carlin Am. Inc.*, No. 14-CV-9270 (RJS), 2016 WL 7507757, at *4 n.4 (S.D.N.Y. Dec. 30, 2016) (quoting 7 *Patry on Copyright* § 25:55 (2016)).

Pursuant to the Indian Copyright Act, the original copyright holder of a "cinematograph film" is its "author." ICA, ch. 4, § 17; *see also* 1 Pravin Anand, Copyright Throughout the World §§ 19:15, 19:18 (2024). Because Shree is the original producer of the *Luck* Film, *see* Compl. ¶ 23, under Indian law Shree is the author and first owner of the copyright in the Film absent agreement to the contrary. ICA, ch. 1, § 2(d)(v); *id.*, ch. 4, § 17. Indeed, in the complaint itself, Plaintiff admits to Shree's prior "ownership of the copyright in the Luck Film." Compl. ¶ 28. Although he claims that Shree's ownership "does not affect, let alone diminish, [his] copyrights in the component works," *id.*, Plaintiff has not alleged that he is or was the original copyright holder, that he executed an agreement with Shree to that effect, or that he was assigned the copyright. Thus, Plaintiff has not plausibly alleged ownership of the copyright in the *Luck* Film.

Alternatively, a plaintiff has standing to bring a copyright claim if he is a "beneficial owner of an exclusive right." *Itar-Tass*, 153 F.3d at 91. The prototypical example of a "beneficial owner" is "the original author who transfers an exclusive copyright to another, but is entitled to receive royalties from that new owner for the exploitation of the author's work." *Wallert*, 141 F. Supp. 3d at 277; *see id.* at 278 (concluding that plaintiff lacked standing where he did "not allege, for example, that [he] assigned the copyright title . . . in exchange for the payment of royalties, as would be necessary to establish his beneficial ownership of [the] composition copyright"). A person may "become a beneficial owner for purposes of section 501(b)" through other circumstances, but he must, at minimum, "obtain[] an equitable interest in an *exclusive* right under a copyright." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018). "It is therefore not enough that a putative beneficial owner obtains a mere interest in a copyright, even if that interest is valuable. The interest must be one that derives its value directly from another person's use of an exclusive right, such that the interest is necessarily diluted by infringement." *Id.*

The Second Circuit has not yet determined what law governs transfer of copyright ownership. *See Itar-Tass*, 153 F.3d at 91 n.11 ("In deciding that the law of the country of origin determines the ownership of copyright, we consider only initial ownership, and have no occasion to consider choice of law issues concerning assignment of rights."); *accord Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1291–92 (11th Cir. 2011) ("Although Indian law undoubtedly governs the determination of initial *copyright ownership*, there is no guiding case law regarding which country's law governs the issue of *copyright transfer*."). Whether Indian or American law governs assignment of the Film's copyright, however, the result is the same, *cf. Saregama*, 635 F.3d at 1292 ("assum[ing] without deciding that Indian law governs the assignment issue, since Indian copyright law of assignment is strikingly similar to U.S. copyright law"): Plaintiff has not plausibly alleged that he holds, has assigned, or has been assigned any exclusive right with respect copyright ownership of the Film.

Under the Indian Copyright Act, "to own a copyright . . . is to have the exclusive right to perform" one or more of the rights set out in section 14(d). *Id.* at 1291. This provision governs the meaning of a copyright with respect to a cinematograph film.[10] *See* ICA, ch. 3, § 14(d). "The ICA makes clear that, when some but not all of the exclusive rights that comprise a copyright are assigned, both the assignor and the assignee are copyright owners with respect to the exclusive rights that they hold." *Saregama*, 635 F.3d at 1292; *see* ICA, ch. 4, § 18(1) (governing assignment). Furthermore, "[n]o assignment of the copyright in any work shall be valid unless it is in writing signed by the assignor or by his duly authorised agent." ICA, ch. 4, § 19.

---

[10] The exclusive rights set forth in § 14(d) are "(i) to make a copy of the film"; "(ii) to sell or give on commercial rental or offer for sale or for such rental, any copy of the film"; and "(iii) to communicate the film to the public." ICA, ch. 3, § 14(d).

Plaintiff does not allege that he ever held, assigned, or was assigned exclusive rights in the Film. To the contrary, he admits that Shree was the original producer and copyright holder of the Film, Compl. ¶¶ 23, 28, says he has no knowledge of why Shemaroo purports to hold the copyright to the Film, and does not know "whether any assignments [of the Film's copyright] have taken place," *id.* ¶ 31. He also concedes that the exclusive rights he retains in the Screenplay to exploit that work do not extend to film. *See id.* ¶ 28 (alleging that he "retains exclusive ownership rights in the Luck Screenplay for . . . exploitation rights of any kind other than as a cinematograph film"). Given these allegations, Plaintiff has not plausibly alleged legal or beneficial ownership of the Film.

Plaintiff nonetheless suggests that he is a beneficial owner because he has a right to obtain royalties in the Film. *See* Pl.'s 12(b)(2) Opp'n 3 & n.4. He has alleged that, because he "created the Luck Story and Luck Screenplay . . . , he retains a copyright ownership interest in the Luck Film" under Indian law. Compl. ¶ 111. He also asserts that he "maintains an ownership interest in the Luck Film that, among other things, entitles [him] to a portion of proceeds from 'utilisation of the work in any form other than for the communication to the public of the work, along with the cinematograph film in a cinema hall.'" *Id.* ¶ 29. But the right to receive royalties from the Film is not an exclusive right of copyright ownership under the Indian Copyright Act. *See* ICA, ch. 3, § 14(d). Nor does it satisfy the standards set forth in this circuit for beneficial ownership. Indeed, the Second Circuit has instructed that a "mere interest in a copyright" is insufficient to establish beneficial ownership. *John Wiley & Sons*, 882 F.3d at 410 ("Because [plaintiff] is only one of potentially numerous entities that potentially can generate revenue from use of the images, [its] interest in the images does not make [it] a beneficial owner of an exclusive right.").

Plaintiff's reliance on *Seoul Broadcasting Systems International, Inc. v. Korea International Satellite Broadcasting* is misplaced. No. 08-CV-5119 (SJO) (VBKx), 2009 WL 10673370 (C.D. Cal. Jan. 27, 2009). In *Seoul Broadcasting*, the plaintiff adequately alleged standing because she pled that she was the "exclusive licensee" under the copyright at issue. *Id.* at *3. Plaintiff has made no comparable allegations here.

Accordingly, because Plaintiff has failed to allege either legal ownership or beneficial ownership of the Film's copyright, his claim for infringement of the Film (Count II) is dismissed.

### B.  Substantial Similarity

Even if he had adequately alleged standing as to the Film, Plaintiff's claims for copyright infringement of the Screenplay and the Film fail because *Luck* and *Squid Game* are clearly not substantially similar.[11]

Plaintiff alleges that his copyright infringement claims survive dismissal because the plots of both works are "nearly identical" and "are advanced through characters with substantially similar traits." Compl. ¶¶ 61–62. The complaint cites sixteen purported similarities in plot, *id.* ¶ 61, and twenty-nine purported parallels between the characters from each work, *id.* ¶¶ 63–67. Shah insists that these and "similarities of selection, arrangement, and coordination of individual composite elements" give rise to a plausible claim of copyright infringement. Pl.'s 12(b)(6) Opp'n 24. Defendants oppose, principally arguing that similarities between the works are unprotectable elements—such as the "general plot idea" and "stock character" traits—or "*scène-à-faire* element[s]" that naturally follow from the premise. Defs.' 12(b)(6) Mot. 13, 21; Defs.' 12(b)(6) Reply 3–4.

---

[11] In the discussion below, the Court on occasion discusses visual and audio elements particular to the Film. Such points bear only on the Court's conclusion as to the Film—that even in the absence of standing, Count II for copyright infringement of the Film must fail—and do not alter the Court's conclusion as to the Screenplay.

Lists, such as the ones Plaintiff has submitted here, "are inherently subjective and unreliable, particularly where the list emphasizes random similarities scattered throughout the works." *Williams v. Crichton*, 84 F.3d 581, 590 (2d Cir. 1996). Accordingly, the Court undertakes its own assessment of the works, guided by the principles set forth below.

### 1. Applicable Law

"The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same. *Abdin*, 971 F.3d at 66. "Where a work contains both protectable and unprotectable elements, however, the analysis must be more discerning." *Montgomery v. Holland*, 408 F. Supp. 3d 353, 362 (S.D.N.Y. 2019). In these circumstances, the court "must attempt to extract the unprotectible elements from [its] consideration and ask whether the *protectible elements, standing alone*, are substantially similar." *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 291 (S.D.N.Y. 2012).

"Courts have developed a number of general principles to identify the elements of a work that are free for the taking and therefore not protectable." *Montgomery*, 408 F. Supp. 3d at 362. Facts, for example, are not copyrightable. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 344 (1991). Nor, critically, are ideas. *Abdin*, 971 F.3d at 68. Indeed, it is axiomatic that copyright protection extends to "the particular expression of an idea and never to the idea itself." *Id.*

To constitute a copyright violation then, "the similarity between two works must concern" an idea's "expression." *Gaito*, 602 F.3d at 67. "This principle . . . assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Id.* To hold otherwise would "narrow[] the field of thought open for development and

exploitation," and "hinder, rather than promote, the professed purpose of the copyright laws, i.e.,

the progress of science and useful arts." *Abdin*, 971 F.3d at 68.

Informed by these principles, a court must decide "whether any alleged similarities"

identified by a plaintiff "are due to protected aesthetic expressions original to the allegedly

infringed work, or whether the similarity is to something in the original that is free for the taking."

*Gaito*, 602 F.3d at 67. Courts should be cautious not to compare alleged similarities at too high a

degree of abstraction, for:

> Upon any work a great number of patterns of increasing generality will fit equally well, as
> more and more of the incident is left out. . . . But there is a point in this series of abstractions
> where [works] are no longer protected, since otherwise the author could prevent the use of
> his ideas, to which, apart from their expression, his property is never extended.

*Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (quoting

*see Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930)).

At the same time, a court should not merely "dissect the works into their separate

components, and compare only those elements which are in themselves copyrightable," *Gaito*, 602

F.3d at 66, for the copyright law's protection can extend to "even a compilation of unprotectable

elements . . . when those elements are arranged in an original manner," *Montgomery*, 408 F. Supp.

3d at 363; *see also Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134

(2d Cir. 2003) ("[T]he defendant may infringe on the plaintiff's work not only through literal

copying of a portion of it, but also by parroting properties that are apparent only when numerous

aesthetic decisions embodied in the plaintiff's work of art . . . are considered in relation to one

another."). Instead, it should "compar[e] the contested design's total concept and overall feel with

that of the allegedly infringed work, as instructed by [the court's] good eyes and common sense."

*Gaito*, 602 F.3d at 66; *see also Williams*, 84 F.3d at 590 (finding it appropriate to "examine the

similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace,

and setting"). "It is only where the points of dissimilarity exceed those that are similar and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate." *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992).

"Though the issue of substantial similarity is frequently a fact issue for jury resolution," *Warner Bros., Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 239 (2d Cir. 1983), the Second Circuit has "repeatedly recognized that, in certain circumstances, it is entirely appropriate for a district court to resolve that question as a matter of law, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar," *Gaito*, 602 F.3d at 63. "If, in making that evaluation, the district court determines that the two works are not substantially similar as a matter of law, the district court can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not plausibly give rise to an entitlement to relief." *Id.* at 64.

### 2. Application

Guided by these principles, the Court compares *Luck*'s and *Squid Game*'s "total concept and feel, theme, characters, plot, sequence, pace, and setting." *Williams*, 84 F.3d at 590. For the reasons that follow, the Court concludes that their "points of dissimilarity exceed those that are similar," and the points of similarity are of such "small import quantitatively [and] qualitatively that a finding of no infringement is appropriate." *Rogers*, 960 F.2d at 308. Indeed, the works are dramatically and drastically different from one another.

### a. The Plot

It is well-settled that a "broad plot idea, or premise, is not a protectible element." *Sheldon*,

748 F. Supp. 2d at 208; *see also Williams*, 84 F.3d at 589 (concluding that the idea of a dinosaur zoo, central to both the *Jurassic Park* works and the *Dinosaur World* books, was unprotectible); *Arden v. Columbia Pictures Indus.*, 908 F. Supp. 1248, 1261 (S.D.N.Y. 1995) (finding the idea of a repeating day, of which only the protagonist is aware, is a "[l]iterary device[]" that "cannot be copyrighted"). Plaintiff does not dispute that the "general plot idea of players competing in a series of games to the death, in hopes of winning a significant prize is not protectible under copyright." Defs.' 12(b)(6) Mot.13. Indeed, the literary device employed in both works at issue here is an idea explored in many others. *See, e.g.*, Suzanne Collins, *The Hunger Games* (2008); *see also* Defs.' 12(b)(6) Mot. at 13–14 (citing the films *The Running Man* (1987), *Mean Guns* (1997), *Battle Royale* (2000), *Series 7: The Contenders* (2001), *13 Tzameti* (2006); and the manga series *Kaiji* (beginning in 1996) and *Liar Game* (beginning in 2005)).

Many of the elements Plaintiff claims as substantially similar are no more than unprotectible *scènes à faire*, or "thematic concepts or scenes which necessarily must follow" from the choice of premise. *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976); *see Montgomery*, 408 F. Supp. 3d at 363 ("[C]opyright protection does not extend to *scenes a faire*, or devices, elements, or sequences of events that necessarily result from the choice of a setting or situation."). "For example, in a work about a superhero, scenes that depict the superhero perform[ing] feats of miraculous strength, wearing a tight-fitting acrobatic costume[], battling wealthy megalomaniacal villains, exercising the power of self-propelled flight, or leading a double life are all unprotectable *scènes à faire*." *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 567 (S.D.N.Y. 2009). Likewise, in the *Dinosaur World* books and the *Jurassic Park* works, the shared setting of a zoo or park, "with electrified fences, automated tours, dinosaur nurseries,

and uniformed workers, . . . are classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur zoo." *Williams*, 84 F.3d at 589.

The same is true here. In a plot centered around a protagonist fighting for his survival in a series of deadly games, it is hardly original that the "main character survives until the end of the competition and wins the prize money, learning about himself in the process." Compl. ¶ 61. In light of the stakes of the game, it "necessarily result[s]" that contestants will be motivated to participate by desperate personal circumstances, whether they result from debt, poverty, an ailing family member, a criminal conviction in their past, or a desire for retribution. *Montgomery*, 408 F. Supp. 3d at 363. The Court therefore has "little trouble concluding that many of the alleged similarities in the parties' works . . . are unprotectible elements that follow naturally from a work's theme rather than from an author's creativity." *Abdin*, 971 F.3d at 71.

Many features of the plots, moreover, meaningfully distinguish each work from the other. *Luck* and *Squid Game* each contains elements that have no counterpart in the other. *See Williams v. Crichton*, 84 F.3d 158, 170 (S.D.N.Y. 1994) (granting summary judgment where, among other reasons, the Plaintiff "ignored major characters and events in [defendant's work] that [did] not comport with his theory of the case"). *Squid Game*, for instance, contains a number of subplots, including an organ harvesting scheme, *see, e.g.*, E5 18:00, and a detective's attempt to locate his missing brother, whom the detective believes competed in a prior game, *see* E2 54:07–54:40. *Luck*, meanwhile, prominently features a romantic subplot between the protagonist Ram and Natasha, and, to a lesser extent, the antagonist's attack of Natasha for rejecting him and the ring he offers. LF 1:24:00, 1:53:18.

The nature of the competitions in each game are also notably distinct. In the Film, sixteen players compete in four games explicitly designed to test their luck. First, standing in a circle, each

player fires a gun at the player to their right, unaware of whether their gun will fire a bullet or a blank. LF 1:00:42–1:05:00. Second, the players jump from a helicopter without knowing whether their backpacks hold functioning parachutes. LF 1:27:24–1:34:40. Third, the players—while handcuffed to a shipping container being lowered into the ocean—must locate the key to unlock their cuffs before they drown or are eaten by sharks surrounding the container. LF 1:41:44–1:46:24. Fourth, after it is revealed that Natasha is an imposter posing as her twin sister, Ram must save her before the train to which she is tied collides with a fuel tank. LF 2:00:33. The very nature of the games are dangerous, and, in each game, the main characters triumph.

In *Squid Game*, by contrast, 456 contestants compete in a series of children's games, some of which are particular to Korean culture. Participants compete to survive in red light, green light, E1 44:54; carving out a shape from a Korean street candy without breaking the candy E3 36:10; tug-of-war, E4 40:24; marbles, E6 16:32; a type of hopscotch on glass tiles, E7 27:30; and squid game, E9 02:03, after which the show is named. While most of the competitions are not inherently dangerous, they have altered stakes such that if participants lose, they will be killed by one of the many masked, armed guards. In the end, unlike in *Luck*, only Gi-hun survives.[12]

Plaintiff nonetheless insists that certain plot points are too similar to arise from chance. The Court is not convinced.

***ATM scene.*** Plaintiff asserts that the works "share a pivotal scene in an ATM vestibule with the main character hitting rock bottom trying to steal cash, after which he is hunted and further beaten down, leaving him emotionally susceptible to join the foul games." Pl.'s 12(b)(6) Opp'n 12. This characterization overstates the importance of the ATM scenes and their similarities, and disregards important differences. In *Squid Game*, approximately four minutes into the more than

---

[12] While Il-nam also survives, he appears to have been killed off-screen, E6 53:33–56:53, and survives unbeknownst to Gi-hun until the final episode, E9 38:50.

nine-hour show, Gi-hun takes his mother's ATM card, only to discover when he attempts to withdraw cash that she has changed the pin. E1 04:23. He successfully guesses that she has changed the pin to his daughter's birthday and withdraws cash which he uses to gamble on horse races. E1 05:20–08:00. He is later discovered by loan sharks who chase him down. E1 08:35–11:55. In *Luck*, Ram successfully guesses a stranger's ATM pin—presumably due to his good luck, given how improbable it was—after forcibly stealing their ATM card. LF 20:41–21:00. Ram takes off running with the stolen cash and soon encounters Tamaang, who saves him from the police. LF 21:09–22:24. It is a low point for the protagonist, and one Tamaang and Musa hearken back to when convincing Ram to join the game. LF 32:53, 51:33. Although Plaintiff asserts that there is a "striking[]" similarity between these scenes, Pl.'s 12(b)(6) Opp'n 10, they are similar only insofar as both characters steal money from ATMs, which follows from the unprotectible idea of a protagonist in debt.

  ***Betting.*** Plaintiff points out that "the games in both [*Luck* and *Squid Game*] are driven by wealthy and depraved onlookers who watch from afar, betting on who will survive, and reveling in the barbarism." Pl.'s 12(b)(6) Opp'n 13. In *Luck*, this is little more than a plot device, LF 1:05:23 ("People all over the world are betting on you."), and in *Squid Game* it is at most a side plot, *see, e.g.*, E9 3:34–3:51 (showing patrons observing and commenting on rules of final round of game). Furthermore, wealthy third parties watching others compete in a shocking game for their own entertainment is not an original or protectible idea. In *The Hunger Games*, for example, the brutal competition is televised to wealthy onlookers who provide financial support to their favored contestants. *See* Suzanne Collins, *The Hunger Games* (2008).

  ***Option to leave***. Plaintiff asserts that *Luck* and *Squid Game* both "involve seemingly legitimate options to leave the games which turn out to be illusory." Pl.'s 12(b)(6) Opp'n 12. Given

the stakes of the game, it naturally follows that some contestants would wish to leave after learning the game's true nature. In *Luck*, a contestant may only leave if they beat Musa in a game of luck. LF 1:07:00–1:09:04. In *Squid Game*, contestants can leave only if the majority vote to do so, E1 40:20—and the majority of contestants do so vote, E2 12:27, only for competitors to decide later to return, E2 55:52–57:00. This plot element is not substantially similar. At most, the works explore similar ideas through differing expressions. *See Abdin*, 971 F.3d at 68 (explaining that copyright protects "the particular expression of an idea" but not "the idea itself").

   ***Identifying players by number.*** Plaintiff next states that "[u]pon arrival, characters in both [*Luck* and *Squid Game*] are dehumanized and identified by numbers." Pl.'s 12(b)(6) Opp'n 12. The assignment of numbers to players follows from the choice of plot. In *Squid Game* unlike in *Luck*, however, the game runners exclusively refer to players by number. While the players in *Luck* wear their numbers on armbands, LF 54:47, they are never referred to by number and their number is irrelevant to the game and the Film. Far from being dehumanized, in *Luck*, Tamaang professes to know each player intimately, LF 2:15:22, and both Musa and Tamaang come to Ram's hospital room at the end of the movie to wish him well, LF 2:15:09–2:15:35.

### b.  The Pace, Sequencing, and Setting

   The pace, sequencing, and settings of these works plainly and notably set the works apart as well. *Squid Game* is a Korean drama series, with scenes set in Seoul, South Korea and inside a playhouse-like building on an unidentified island off of the mainland. Nearly five-hundred players compete during a competition that lasts approximately one week. The colorful setting, children's games, music, and costume-like uniforms of the guards and contestants contrast eerily with the consequences for losing. Players live in a single room filled with utilitarian bunk beds and are not

permitted electronics or any way to contact the outside world. It is a dark and dystopian series, in which few characters are fundamentally, morally good.

*Luck* begins in Mumbai, India. LF 1:37. The movie is fast-paced, quickly unveiling the back stories of Musa and the main contestants before the game convenes in Cape Town, South Africa. LF 9:57–50:10. When the sixteen contestants are not competing, they are primarily depicted relaxing and forming bonds in a comfortable hotel. LF 1:12:00–1:13:00, 1:18:00, 1:19:40. During this time, they are not cut off from the outside world and can do what they will with the winnings they earn throughout the game. LF 1:22:16. The competition is said to last twenty days. LF 47:34. At times the Bollywood Film feels akin to a stylized music video, prominently featuring musical dances and upbeat music. *See, e.g.*, LF 24:28–26:24, 48:43, 52:09–52:50, 53:35–54:09.[13] Indeed, the movie begins and ends with a choreographed musical number, in which one or more of the characters sings. LF 5:42–9:10, 2:16:12.

### c. The Themes

Plaintiff fairly suggests that both works share themes of financial desperation, greed, and what people are willing to do for money. Pl.'s 12(b)(6) Opp'n 20. These themes follow from the choice of plot, but they feature much more prominently in *Squid Game* than in *Luck*. While in *Squid Game*, for example, all the contestants are in substantial debt, E1 37:48–38:25, in *Luck*, Ram is the only contestant the viewer learns is in significant debt, LF 12:50–14:08. In *Squid Game*,

---

[13] Plaintiff asks this Court to disregard those differences that result naturally from the different choice of media, as well as "the plain contrast between *Luck*'s Bollywood features and *Squid Game*'s K-Drama features," as "immaterial to an infringement analysis." Pl.'s 12(b)(6) Opp'n 23. The Court does not agree that it should simply disregard the elements Plaintiff suggests, such as the pace and setting. The Court is mindful of those differences that arise purely from a difference of medium, *see Faulkner v. Nat'l Geographic Soc'y*, 409 F.3d 26, 40 (2d Cir. 2005) ("The transfer of a work from one medium to another generally does not alter its character for copyright purposes."), and genre, *see Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 139 (2d Cir. 1998) (noting that differences in genre diminishes the import of differences in the "total concept and feel"), but nonetheless concludes that "'material portions' of the corresponding works" are not substantially similar, Pl.'s 12(b)(6) Opp'n 23 (quoting *Tufenkian*, 338 F.3d at 135).

participants contribute to other players' demise in order to increase the potential pot of winnings and improve their chances at succeeding. E4 15:40–19:50. In this way, *Squid Game* becomes a test of the contestants and what they are willing to do to advance their wealth and to survive, a lesson Il-nam spells out in the final episode of the season. E9 36:30–38:42 ("Do you know what someone with no money has in common with someone with too much money? Living is no fun for them . . . . I never forced anyone to play that game. You also ended up coming back of your own accord. Do you really still trust people?"). Indeed, the very premise of the game in *Squid Game*—and the reason, viewers ultimately learn, why Oh Il-nam created it—was in part a test of the humanity of the contestants and of mankind. *See* E9 30:41–35:18 (insisting that Gi-hun "[p]lay another game with [him]" to see whether anyone will help a homeless man outside in the cold and questioning if he "still ha[s] faith in people—after all [he's] been through"). In *Luck*, by contrast, one player's success does not necessarily spell the downfall of another, as players earn money with each round and at least four of the contestants survive the game to meet their happy ending.

More central to *Luck* are themes of luck, fate, and the "the complexity of fortune." Pl.'s 12(b)(6) Opp'n 20. The musical introductory sequence revolves around the concepts of destiny and fate and encourages listeners to "try [their] luck." LF 5:46–9:14. Good fortune, rather than debt, unites the contestants, and the notion of luck is mentioned throughout the Film. *See, e.g.*, LF 59:17 ("Two types of people take part in this game. Those who have good luck. And those who have very good luck."); LF 1:11:10 ("Gambling becomes interesting, when the opponent has a strong luck."); LF 11:46–11:53 ("Musa is searching for people whose luck can defeat death, just like him."); LF 22:11–22:33 ("Your luck is great. . . . I'm into investments. . . . I invest in people's luck."); LF 1:07:00–1:07:11 ("What brought you here? Your luck. And who'll take you back? Your luck."); LF 33:00–33:05 ("Not many realize that luck is with them. Luck—something so strong

that it can even evade death."); LF 1:39:05 ("If there's anything that you have, it's just you and your luck."); LF 2:15:05 ("Luck only favors those who have the will to win."). While the success of contestants in *Squid Game* necessarily depends in part on luck, as it does in most games, only *Luck* suggests that a person's good fortune is a nearly immutable characteristic.

### d. The Characters

Plaintiff next argues that the characters in *Luck* and *Squid Game* are substantially similar. Not so.

"In determining whether characters are similar, a court looks at the totality of the characters' attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in the plaintiff's work." *Abdin*, 405 F. Supp. 3d at 599. "No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines." *Smith v. Weinstein*, 578 F. Supp. 1297, 1303 (S.D.N.Y. 1984). "[G]eneric and generalized character traits such as race, gender, and hair color are not protectible." *Abdin*, 971 F.3d at 67; *see Nichols*, 45 F.2d at 121 ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.").

"The bar for substantial similarity in a character is set quite high," *Sheldon*, 748 F. Supp. 2d at 208, and clearing it "is no easy feat." *Nobile v. Watts*, 289 F. Supp. 3d 527, 535 (S.D.N.Y. 2017) ("[F]or example, self-centered bachelors in their mid-thirties who pursued love interests and became trapped in a repeating day[, ]have not been considered substantially similar since the similarities existed at a level of abstraction too basic to permit an inference of unlawful copying."). As with the theme and the plot, examination of the works does not reveal substantial similarity among the characters. Far from it, this comparison underscores the differences in "attributes and

traits," as well as in "the total concept and feel of figures," in each work. *Abdin*, 405 F. Supp. 3d at 599.

### i. Protagonists

The Court first examines the protagonists from each work. In *Luck*, Ram Mehra, is a confident, stoic man who works a white-collar job and cares for his widowed mother. LF 15:03–15:48, 18:03–18:08. He is in debt because of his father's poor decisions and determined to right them for his mother. LF 12:50–14:08. In *Squid Game*, the protagonist Seong Gi-hun is an indigent, divorced chauffer, who is a father to a young daughter, and lives with his elderly mother in Seoul. He is in debt because of his apparent gambling addiction. E1 05:20–08:00. He initially appears as a silly and rash person, who lacks appreciation for the seriousness of his circumstances. Each character is hesitant to join the game, but ultimately decides to take part principally due to the opportunity for financial gain. LF 32:28–33:36, 47:25; E1 27:00–29:46.

While the characters do share certain similarities—a "debt that needs to be repaid," an "aging and widowed mother[]," a "reluctan[ce] to join the mysterious game," Compl. ¶ 63—these are overshadowed by the characters' many and substantial differences. Each, for example, has "appreciably different" culpability for their circumstances and attitude toward the games in which they participate. *Davis*, 2024 WL 1178014, at *16. At the outset of the games, Gi-hun presents as irresponsible and even naïve. His debt is his own doing, and he appears to have little understanding or regard, for example, for why his mother might have changed her ATM pin to keep him from accessing her bank account. Throughout the show, his character becomes increasingly desperate and then morally compromised and disillusioned by the game, culminating in his decision to cheat and betray Il-nam during the fourth game. E6 36:23. Ram, by contrast, joins the game in order to pay off his father's debt, save his mother's home, and hide his father's poor decisions from his

mother. LF 12:50–13:46. After the first game, he calls his mother to tell her that he will be sending her money—his winnings from the first round. LF 1:22:16. And he repeatedly saves other characters from harm throughout the game. *See, e.g.*, LF 1:46:12.

Although Plaintiff contends that each character "demonstrate[s] a weakness for gambling," Compl. ¶ 63, the Film depicts Ram gambling for the first time when Tamaang takes him to a casino. While he appears to enjoy the experience, presumably because he experiences extraordinary success, LF 24:48–26:24, he does not return. Gi-hun, by contrast, continues to gamble despite his past losses and the harm it has caused him and his family.

Courts have declined to find substantial similarity between characters that were as or more alike than those at issue here. *See, e.g.*, *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) (concluding that characters were not substantially similar where both works featured "half-human, half-vampire main character named Nicholas Gaunt" with similar attributes); *Arden*, 908 F. Supp. at 1261 (finding that protagonists were not substantially similar where they were each "somewhat chauvinistic and self-centered" "bachelors in their thirties," who "pursue[d] love interests" and were stuck in a repeating day); *Sheldon*, 748 F. Supp. 2d at 208 (finding that characters in *Rear Window* and *Disturbia* were not substantially similar where each was male, single, "confined to his home," "spie[d] on neighbors to stave off boredom and, in so doing, discovere[d] that one of his neighbors [was] a murderer"); *Davis*, 2024 WL 1178014, at *15 (reasoning that characters were not substantially similar although they each depicted "young, African American, female, lead characters in their second year of teaching at an inner-city school," and each taught the school's step team).

The similarities between Ram and Gi-hun are simply "too general to be afforded protection under copyright law," particularly "when the totality of the characters' attributes and traits are

considered." *Sheldon*, 748 F. Supp. 2d at 209. Accordingly, with respect to these protagonists, the "high" bar for substantial similarity among characters is not met. *Id.* at 208.

### ii. Supporting Characters

The Court next compares the supporting characters and finds their similarities too "general" and "undeveloped" to support a plausible claim of infringement as well. *Abdin*, 971 F.3d at 73.

The most significant similarity Plaintiff identifies among the supporting characters is between Musa and Il-nam, the wealthy creators of the games in each work. Pl.'s 12(b)(6) Opp'n 18. The two share character traits, however, only at a high level of abstraction too general to be protectible. *See Smith,* 578 F. Supp. at 1303 ("No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines."). The idea of a wealthy, "jaded" "boss[]," Pl.'s 12(b)(6) Opp'n 18, is no more than a "basic character type[]," and one that follows naturally from the choice of plot. *Montgomery*, 408 F. Supp. 3d at 363. Examined at a more granular level, Musa and Il-nam's portrayals are too different to support a copyright infringement claim. Il-nam is initially depicted as a quiet, simple, seemingly kind older man, who is struggling with dementia, but is later revealed to be extremely wealthy and cunning. Musa, by contrast, is gregarious and his principal character trait is his luck. He is known to be the orchestrator of the game, which he purports to have created as a "pure business" proposition, LF 1:11:04, and participates only insofar as a player must beat him in a game of luck in order to leave the game. The identity of Il-nam as the game's creator, meanwhile, is not revealed until the final episode.

The remaining similarities Plaintiff identifies among characters are no more than stock traits and superficial similarities. Plaintiff asserts, for example, that *Luck*'s Shortcut and *Squid*

33

*Game*'s Ali are similar because each is Pakistani, whereas "virtually every [other] character" is not; is "in the games because they have been victims of servitude"; has a "physical deformit[y]"; and is "remarkably capable and willing to trust others" despite their past. Pl.'s 12(b)(6) Opp'n 18–19. The characters' nationalities and status as outsiders are not protectible traits. *See Abdin*, 971 F.3d at 67 (explaining that "generic and generalized character traits such as race, gender, and hair color are not protectible"). Plaintiff's overbroad characterization, moreover, ignores what are far more salient differences between the two. Shortcut is a confident teenager, who previously spent her life riding camels after she was sold into slavery by her parents. Her leg is bitten off by a shark during the competition. LF 1:46:08. Ali, by contrast, is a shy man who lives in South Korea. His boss has not paid him the wages he is due, and he is missing two fingers due to an accident he suffered at work before entering the games. E2 32:00–32:34.

Plaintiff next contends that *Luck*'s Raghav and *Squid Game*'s Jang Deok-su are analogous antagonists. Although they "are both criminals with psychopathic tendencies and a sociopathic absence of remorse," Pl.'s 12(b)(6) Opp'n 17; *see also* Compl. ¶ 63, these are no more than basic character types. *Montgomery*, 408 F. Supp. 3d at 363 ("Stock characters and basic character types are not entitled to copyright.").

Plaintiff also asserts that Tamaang and *Squid Game*'s Suit Man each "entice the characters to join the deadly game" but purportedly "lack any real personality." Compl. ¶ 66. Plaintiff's characterization disregards Tamaang's centrality to the plot and his connection to Ram and Musa through the Film. In any event, the idea of a front man who recruits participants follows naturally from the choice of plot and is too "generic" to be entitled to copyright protection. *See Abdin*, 971 F.3d at 72.

34

### e. Total Concept and Overall Feel

Finally, the total concept and overall feel of these works is entirely, and meaningfully, distinct. These differences result from more than differences in genre. *See Castle Rock Ent., Inc.*, 150 F.3d at 139.

*Luck* is substantially more upbeat, faster-paced, and lighter in tone than the first season of *Squid Game*. Its emphasis on luck lends it a sense of magical realism. *Squid Game*, by contrast, is dark and deeply unsettling, despite its bright and childlike setting and costumes.

The differences in the endings of *Luck* and *Squid Game* further reflect and underscore their differences in tones. *Cf. Canal+ Image UK Ltd. v. Lutvak*, 773 F. Supp. 2d 419, 438 (S.D.N.Y. 2011) ("It is also notable that an observer following the story of each work could not fail to notice that the works—to the extent that they differ from the Novel—have different endings that reflect the works' different comedic registers."). In *Squid Game*, all but Gi-hun are killed in the game and he is left traumatized and vengeful. In a final encounter with Il-nam, Gi-hun screams at him to explain why he created the game and threatens to kill him. E9 32:12.

In *Luck*, the four main contestants survive the game and live to see a happy ending. After the game, both Tamaang and Musa visit Ram in the hospital to wish her well, a visit that is well-received by Ram. LF 2:15:09–2:15:35. A shot of Ram, Natasha, Major, and Shortcut follows, each well-dressed and smiling as they walk triumphantly out of what appears to be a casino. LF 2:15:38. Before and as the credits roll, Ram and Natasha are depicted dancing and singing about taking chances in life. LF 2:16:12.

*** 

In short, while there are certain similarities between *Luck* and *Squid Game* that arise from a shared broad premise, an examination of the underlying works reveals that the similarities are

35

not nearly so many or so substantial as Plaintiff asserts, and those that exist are, or follow naturally from, unprotectable elements.[14] The Court finds, therefore, that the "points of dissimilarity" between Plaintiff's and Defendants' works far "exceed those that are similar." *Davis*, 2024 WL 1178014, at *19 (quoting *Rogers*, 960 F.2d at 308). Accordingly, Defendants' 12(b)(6) motion is granted and the complaint is dismissed.

### III.    Leave to Amend

Although Plaintiff has not requested an opportunity to amend, a district court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Ordinarily, where a court dismisses for lack of standing and "it is conceivable that the [plaintiff] may one day acquire standing to bring such claims," it is appropriate to permit opportunity for amendment. *Wallert*, 141 F. Supp. 3d at 287. But even if Plaintiff could adequately allege standing in the Film, "granting Plaintiff leave to amend would be futile because the finding of a lack of substantial similarity"—which applies equally to the Film and Screenplay—"turns on the works themselves and not on the artfulness or sufficiency of the pleading." *Jones v. Atl. Records*, No. 22-CV-893 (ALC), 2023 WL 5577282, at *8 (S.D.N.Y. Aug. 29, 2023); *see also Clanton v. UMG Recordings*, 556 F. Supp. 3d 322, 334–35 (S.D.N.Y. 2021) (same); *Kaye v. Cartoon Network, Inc.*, 297 F. Supp. 3d 362, 371 (S.D.N.Y. 2017) (same). Accordingly, leave to amend will not be granted.

### CONCLUSION

For the foregoing reasons, Defendants' Rule 12(b)(6) motion to dismiss is granted and the complaint is dismissed with prejudice. The Clerk of Court is respectfully directed to close the

---

[14] Plaintiff also alleges that statements by third parties on the internet demonstrate the substantial similarity of the Film and the *Squid Game* series. *See* Compl. ¶¶ 76–78. "This argument is meritless." *Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 597 (S.D.N.Y. 2009). "[T]he opinions of third parties in secondary materials are irrelevant, as comparison of secondary or descriptive materials cannot prove substantial similarity under the copyright laws . . . because the works themselves, not descriptions or impressions of them, are the real test for claims of infringement." *Id.*

motions pending at Dkt Nos. 27 and 30 and to terminate this action.

SO ORDERED.

Dated:      September 30, 2025
            New York, New York


                                        _____
                                        Ronnie Abrams
                                        United States District Judge